UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION,<br><br>                              Plaintiff,<br><br>        -against-<br><br>COMMONWEALTH OF PUERTO RICO, RICARDO ROSSELLÓ NEVARES, RAÚL MALDONADO, JOSÉ IVÁN MARRERO ROSADO, GERARDO JOSÉ PORTELA FRANCO, JOSÉ B. CARRIÓN III, ANDREW G. BIGGS, CARLOS M. GARCÍA, ARTHUR J. GONZALEZ, JOSÉ R. GONZÁLEZ, ANA J. MATOSANTOS, DAVID A. SKEEL, JR., ELÍAS SÁNCHEZ, JOHN DOES 1-12, and FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>                              Defendants. | Civil No. 17-cv-1567 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF RELATING TO COFINA

Plaintiff Ambac Assurance Corporation ("Ambac"), by its attorneys Ferraiuoli LLC, and Milbank, Tweed, Hadley & McCloy LLP, for its Complaint against defendants the Commonwealth of Puerto Rico (the "Commonwealth"), Ricardo Rosselló Nevares, Raúl Maldonado, José Iván Marrero Rosado, Gerardo José Portela Franco, José B. Carrión III, Andrew G. Biggs, Carlos M. García, Arthur J. González, José R. González, Ana J. Matosantos, David A. Skeel, Jr., Elías Sánchez, John Does 1-12, and the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    Sovereignty confers great power, but it does not authorize lawlessness.  This action seeks to halt the latest in a series of unconstitutional and unlawful acts that have been the unfortunate *modus operandi* of the Commonwealth government in seeking to manage its financial and economic distress.  Instead of rectifying these abuses, the Oversight Board created by Congress to restore fiscal responsibility to the Commonwealth has affirmatively ***exacerbated*** them, giving its imprimatur to an ongoing scheme of constitutional and statutory violations that can only be called theft.

2.    The Commonwealth's asset grabs began on November 30, 2015, when then-Governor Alejandro García Padilla announced that the property belonging to certain Puerto Rico public corporations (and pledged to their bondholders) would be taken to meet the Commonwealth's spending needs.  The pillaging intensified as Puerto Rico's Legislative Assembly passed moratorium legislation authorizing the Governor to default on various bond obligations and to reorder constitutional and statutory payment priorities as he saw fit.

3.    Until recently, the one Puerto Rico entity spared from this scheme was the Puerto Rico Sales Tax Financing Corporation, known by its Spanish acronym "COFINA."  COFINA was the Commonwealth's original rescue bond.  It was created a decade ago in the midst of a financial and economic crisis—at the time the most urgent in Puerto Rico's history—and enabled the Commonwealth to access the capital markets on affordable terms in circumstances where they would have otherwise been closed.  It was able to do so because COFINA was structured as a securitization vehicle that insulated it from the inevitable temptations of politics and spending.  Specifically, instead of simply promising to transfer money to COFINA to secure repayment of its bonds, the Legislative Assembly made a percentage of the Commonwealth's sales-and-use tax

revenues (the "SUT Revenues") the property of COFINA; required that the SUT Revenues be deposited directly in a fund created for COFINA outside the control of the Commonwealth; and declared that, as a legal matter, the SUT Revenues would not be available for the Commonwealth's spending needs under any circumstances.

4.    Now, the Commonwealth apparently views COFINA as just another pot of money to be looted. Ironically, it has come to that view under the direction of the Oversight Board, which was created by Congress pursuant to the Puerto Rico Oversight, Management, and Stability Act ("PROMESA") to put the Commonwealth's fiscal house in order and thereby facilitate Puerto Rico's access to the capital markets.

5.    Under the guise of fiscal discipline, the Commonwealth has proposed, and the Oversight Board has certified, a fiscal plan (the "Fiscal Plan," attached hereto as Exhibit A) that *escalates* and entrenches as the foundation of Puerto Rico's future the ongoing lawlessness. Among other objectionable features, the Fiscal Plan:

- treats COFINA's property as the property of the Commonwealth, to be used for the Commonwealth's everyday expenses while depriving COFINA of its sole revenue stream;

- turns Puerto Rico constitutional and statutory law on its head, giving COFINA's obligations (and all other Commonwealth bonds) last priority when in fact Puerto Rico law requires that COFINA's funds remain untouched; and

- in the process, imposes a ***77.4% haircut on debt obligations*** while actually ***increasing spending*** over a ten-year period.

6.    In certifying the Fiscal Plan, the Oversight Board consciously intended for COFINA's property to be appropriated. Elías Sánchez, an *ex officio* member of the Oversight Board and representative of the Commonwealth government, has stated forthrightly that ***"[t]he Fiscal Plan is conceptualized in the idea that all revenues of the government will now go to a single fund (contrary to what occurs now with COFINA)."***

7.    The Fiscal Plan is the centerpiece of the PROMESA framework—not only must all Commonwealth budgets and laws adhere to it, but any consensual "Title VI" restructuring or involuntary "Title III" restructuring under PROMESA must also be premised on it.  Thus, a Fiscal Plan that flouts constitutional and statutory rights will require continued constitutional breaches and illegal acts by the Commonwealth to adhere to it.  That is exactly what is happening now in Puerto Rico.

8.    First, on Friday, April 28, 2017, the Legislative Assembly passed a purported "Fiscal Plan Compliance Law" (attached hereto as Exhibit B),[1] which, as its name indicates, further implements the expropriation of protected assets mandated by the Fiscal Plan.  As it concerns COFINA, the Fiscal Plan Compliance Law purportedly requires that all funds belonging to Commonwealth public corporations, including the SUT Revenues belonging to COFINA, must first flow through the general fund of the Commonwealth (the "General Fund") to be used for general Commonwealth needs at the discretion of the Secretary of the Treasury.  In so providing, the Fiscal Plan Compliance Law attempts to fundamentally dismantle the very structure that made COFINA a successful financing vehicle.

9.    Late in the evening that same day, the Commonwealth publicly disclosed a purported Title VI "proposal" that, far from offering a path to conciliation, opportunistically sought to "check the box" on a consensual restructuring process in order to smooth the road to bankruptcy.  The proposal advanced draconian cuts to COFINA's bonds (notwithstanding Puerto Rico law putting those funds out of the reach of the Commonwealth), failed to recognize the seniority of the senior COFINA bonds, and included a "death trap" mechanism offering creditors

---

[1] The official English translation of the Fiscal Plan Compliance Law is not yet available.  Accordingly, only the Spanish version is attached as an exhibit to this Complaint.  Pursuant to Local Rule 5(g), Ambac has moved separately to file a certified English translation at a later date.

2.5 cents on the dollar for their bonds if they refuse to capitulate.  And it did so in brazen disregard for and direct breach of Ambac's contractual consent rights, which require Ambac's consent for the initiation of any restructuring proposal.  The proposal was the antithesis of good faith.

10.    The continued assault on COFINA by the Commonwealth and COFINA's failure to defend and protect its revenues has resulted in events of default under the COFINA bond resolution (the "COFINA Resolution," attached hereto as Exhibit C).  First, under the COFINA Resolution, COFINA covenanted to "defend, preserve and protect" the COFINA structure and the rights of COFINA's creditors.  Ex. C § 705.  It has failed to do so, standing idly by as the Legislative Assembly has dismantled the COFINA structure through the Fiscal Plan Compliance Law.   Second, the Commonwealth covenanted, both in the COFINA Resolution and in COFINA's enabling legislation, not to take any action that would interfere with the rights of COFINA's creditors.  The Fiscal Plan and the Fiscal Plan Compliance Law flagrantly violate that contractual and statutory covenant.

11.    More fundamentally, by engaging in the foregoing acts, the Commonwealth and the Oversight Board have violated Ambac's constitutional and statutory rights as insurer of approximately $1.3 billion in current net accreted value of COFINA bonds (and direct owner of more).  Specifically, the Fiscal Plan and Fiscal Plan Compliance Law have:

- substantially impaired Ambac's contract rights in violation of the Contracts Clause of Article I, Section 10, Clause 1 (the "Contracts Clause") of the United States Constitution (the "U.S. Constitution");

- taken Ambac's property without just compensation or due process of law in violation of the Takings Clause (the "Takings Clause") of the Fifth Amendment to the U.S. Constitution and Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution (the "Due Process Clauses");

- enacted or issued laws and executive orders that are expressly preempted by Section 303 of PROMESA; and

- transferred COFINA's property to the Commonwealth in violation of Section 407 of PROMESA.

12.     As the insurer of a wide variety of Commonwealth debt across numerous structures, many with maturities extending out decades, Ambac is committed to Puerto Rico's long-term success.  But that success—and any sustainable restructuring—can be achieved only by an approach that respects lawful priorities and liens, as Congress required in extending Puerto Rico the PROMESA lifeline.  *See* 48 U.S.C. § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements" of the Commonwealth).

13.     Instead, the Commonwealth, egged on by the Oversight Board, continues to flagrantly disregard the rule of law.  Accordingly, Ambac seeks (1) a declaratory judgment that the Fiscal Plan and Fiscal Plan Compliance Law are unconstitutional and illegal and that an event of default has occurred under the COFINA Resolution; and (2) an injunction against the filing of any Title III petitions or any future legislation, rules, budgets, or restructuring plans premised on the illegal Fiscal Plan.

## THE PARTIES

14.     Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York, 10004.

15.     Ambac is a monoline insurer that provides financial guarantees to the United States and global public finance, infrastructure, and structured finance markets.

16.     Ambac brings this action to protect and enforce its rights under the U.S. Constitution and duly enacted federal law, as described below.

17.     Defendant the Commonwealth is a territory of the United States.

18.    Defendant Ricardo Rosselló Nevares (the "Governor") is the Governor of the Commonwealth.  The Governor had ultimate authority for the development and submission of the Fiscal Plan and signed into law the Fiscal Plan Compliance Law.  Ambac sues the Governor in his official capacity.

19.    Defendant Raúl Maldonado (the "Secretary of Treasury") is the Secretary of Treasury of the Commonwealth.  The Secretary of the Treasury participated in the development and submission of the Fiscal Plan and the Fiscal Plan Compliance Law.  Ambac sues the Secretary of Treasury in his official capacity.

20.    Defendant José Iván Marrero Rosado (the "OMB Director") is the Director of the Office of Management and Budget ("OMB").   The OMB Director participated in the development and submission of the Fiscal Plan and the Fiscal Plan Compliance Law.  Ambac sues the OMB Director in his official capacity.

21.    Defendant Gerardo José Portela Franco is the Executive Director of the Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AAFAF").  Subject to the Governor's ultimate authority, Portela oversaw and directed the development and submission of the Fiscal Plan, and participated in the development of the Fiscal Plan Compliance Law.  Ambac sues Portela in his official capacity.

22.    Defendant José B. Carrión III is the Chairman of the Oversight Board.  Carrión participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Carrión in his official capacity.

23.     Defendant Andrew G. Biggs is a member of the Oversight Board.  Biggs participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Biggs in his official capacity.

24.     Defendant Carlos M. García is a member of the Oversight Board.  García participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues García in his official capacity.

25.     Defendant Arthur J. González is a member of the Oversight Board.  Arthur González participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA. Ambac sues Arthur González in his official capacity.

26.     Defendant José R. González is a member of the Oversight Board.  José González participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues José González in his official capacity.

27.     Defendant Ana J. Matosantos is a member of the Oversight Board.  Matosantos participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted

by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Matosantos in her official capacity.

28.    Defendant David A. Skeel, Jr. is a member of the Oversight Board.  Skeel participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Skeel in his official capacity.

29.    Defendant Elías Sánchez is an *ex officio* member of the Oversight Board. Sánchez was appointed to the Oversight Board by the Governor.  Sánchez participated in the Oversight Board's certification of the Fiscal Plan and will participate, together with the other members of the Oversight Board, in the Oversight Board's consideration of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Sánchez in his official capacity.

30.    Defendants John Does 1-12 are any successors to the Defendants listed above in paragraphs 17-28.  Ambac sues John Does 1-12 in their official capacities.

31.    Defendant the Oversight Board is an entity within the Commonwealth government established pursuant to PROMESA.  The Oversight Board certified the Fiscal Plan, and has ongoing responsibility for the review and approval of any budgets proposed by the Commonwealth, and laws or regulations concerning the Commonwealth's finances.

## JURISDICTION AND VENUE

32.    This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and a federal statute.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse

citizenship and the amount in controversy exceeds $75,000. Ambac seeks a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.

33.    Section 106(e) of PROMESA does not deprive the Court of jurisdiction over Ambac's challenge to the Oversight Board's certification of the Fiscal Plan because that challenge arises under the U.S. Constitution. *See, e.g.*, *Johnson v. Robison*, 415 U.S. 361 (1974).

34.    This complaint presents an actual controversy that is ripe for adjudication. As described below, pursuant to the Fiscal Plan and the Fiscal Plan Compliance Law, Defendants have already caused injury in fact to Ambac by requiring the SUT Revenues to be diverted from the security and payment of the COFINA bonds it insures to other, unconstitutional uses. Among other things, the Fiscal Plan treats the SUT Revenues belonging to COFINA as General Fund revenues, notwithstanding their explicit statutory carve-out from the General Fund, and the Fiscal Plan Compliance Law operationalizes the Fiscal Plan's disregard for the COFINA structure by requiring the deposit of the SUT Revenues into the General Fund. In doing so, Defendants are depriving COFINA of the only collateral available to repay its debts, thereby guaranteeing defaults on its bonds. Ambac is required to make payment on claims of holders of insured COFINA bonds pursuant to its financial guaranty insurance policies in the event COFINA defaults on its payments to such holders.

35.    Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

## I.    Ambac Insures Bonds Issued By COFINA

36.    Ambac is a provider of financial guaranty insurance, by which an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other

obligation.  Ambac insures scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world. Under relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Ambac neither satisfies nor discharges an issuer's obligation to pay and, to the extent Ambac makes such payments, Ambac obtains assignments of rights from the bondholders, becomes an owner of the bonds, and/or becomes subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

37.    One reason governments and municipalities, including COFINA, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds.  Such insurance is especially important for issuers such as the Commonwealth and COFINA who have—and will have—significant borrowing needs, notwithstanding their lower credit ratings.

## II.    Puerto Rico's Debt Priority Provisions

38.    The Puerto Rico Constitution and Commonwealth statutes contain a number of provisions that, when read together, create a detailed priority scheme with varying levels of protections for different types of bonds.

### A.    GO Bonds' First Priority to "Available Resources"

39.    The Puerto Rico Constitution contains a number of provisions designed to ensure that general obligation ("GO") debt is repaid in full.

40.    First, Article VI, Section 2 imposes a limit on the amount of debt that can be issued in a given fiscal year for which the Commonwealth pledges its "full faith, credit and taxing power."  P.R. Const. art. VI, § 2.  The formula for measuring that GO debt limit is

determined by reference to the amount of money "raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico" in the two preceding fiscal years. *Id.*

41.    Second, Article VI, Section 7 imposes a balanced budget requirement, providing that "the appropriations made for any fiscal year shall not exceed the total resources, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." *Id.* § 7.  With respect to GO debt (as well as other obligations of the Commonwealth), Section 7 effectively requires that the Commonwealth appropriate sufficient funds to meet those obligations, or raise taxes to supply the necessary funds if estimated revenues are insufficient to meet them.

42.    Third, Article VI, Section 8 guides the executive branch's disbursement of funds should "available resources" fall short of the estimated resources referenced in Section 7:

> In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

*Id.* § 8.

43.    Article VI, Section 8 creates what is frequently referred to as a "constitutional priority" for GO debt (the "GO Priority").  According to the GO Priority, GO debt has a first claim on "available resources"—*i.e.*, resources "covered into the Treasury of Puerto Rico" (*id.* § 2)—in the event of a fiscal year shortfall.  Section 2 creates a limited private right of action to enforce this provision, stating that "any holder of [GO] bonds or notes" may sue to compel the Secretary of the Treasury to apply "available resources" to the payment of GO debt "in any case provided for by Section 8 of this Article VI."  *Id.* § 2.

**B.    Revenue Bonds' Second Priority to "Available Resources"**

44.    In the event the GO Priority is triggered, Article VI, Section 8 of the Puerto Rico Constitution provides that, following payment of GO debt, "other disbursements shall thereafter be made in accordance with the order of priorities established by law." *Id.* § 8.  That "order of priorities" was established by Section 4(c) of the Management and Budget Office Organic Act (Act No. 147 of June 18, 1980, the "OMB Act"), which sets certain "priority guidelines" for the disbursement of public funds in furtherance of Article VI, Section 8.

45.    In the event of the fiscal year shortfall contemplated by Article VI, Section 8, the OMB Act first requires "payment of interest and amortizations corresponding to the public debt." 23 L.P.R.A. § 104(c)(1).  The OMB Act next assigns a second-priority status to "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and ***binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico***." *Id.* § 104(c)(2) (emphasis added).  The OMB Act then provides for lower tiers of priority, including "regular expenses" relating to government operations (third priority), "construction of capital works" (fourth priority), and "contracts and commitments contracted under special appropriations" (fifth priority). *Id.* § 104(c)(3)-(5).

46.    Thus, in implementing Article VI, Section 8, the OMB Act gives debt issued by Puerto Rico instrumentalities and other obligations affecting the Commonwealth's "credit, reputation and good name" a priority to the Commonwealth's available resources that is second only to payment of GO debt.

47.    Examples of such debt include bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA"), Puerto Rico Highways and Transportation Authority ("PRHTA"), and Puerto Rico Convention Center District Authority ("PRCCDA") (together, the

"Revenue Bonds").  The Revenue Bonds are secured by specific revenue streams—rum taxes with respect to PRIFA, toll revenues and gas taxes with respect to PRHTA, and hotel occupancy taxes with respect to PRCCDA.  Each of these revenue streams flows initially into the General Fund and is then distributed by the Secretary of the Treasury to the respective entities.

48.    The laws under which the Revenue Bonds have been issued and related offering disclosures are explicit that the funds constitute available resources within the meaning of Article VI, Section 8.  Those laws and offering materials accordingly make clear that such funds are permitted to be used, or "clawed back," for payment of GO debt under appropriate circumstances—namely, in the event of a fiscal year shortfall and only when all other available resources for the relevant fiscal year are insufficient to pay GO debt.

III.    **The Puerto Rico Legislative Assembly Affords COFINA Unique Legal Protections to Address a Financial and Economic Emergency**

49.    In 2006, Puerto Rico faced an exigent financial and economic crisis—at the time one of the worst in the Commonwealth's history.  *See* Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246, 247 (codified as amended at P.R. Laws Ann. tit. 13, § 12).  As a result, the Commonwealth had an urgent need for financing in difficult market conditions.  To meet this need, the Puerto Rico Legislative Assembly established COFINA, "a corporate and political entity independent and separate from the Commonwealth of Puerto Rico" created "for the purpose of issuing bonds and utilizing other financing mechanisms."  13 L.P.R.A. §§ 11a(a)-(b).

50.    COFINA was designed as a securitization structure commonly utilized in municipal financing that would give investors in COFINA bonds additional protections over and above those afforded to GO Bonds or Revenue Bonds.  Specifically, COFINA's enabling legislation created a special fund known as the *Fondo de Interes Apremiante*, or "FIA."  13 L.P.R.A. § 12.  The statute provided that all funds deposited in the FIA and all future funds

required to be deposited therein "are hereby transferred to, and shall be the property of COFINA." 13 L.P.R.A. § 12. The funds to be deposited in the FIA are the "first revenues" of the SUT up to a certain minimum amount, with COFINA then receiving a percentage of SUT revenues generated above the minimum amount. *Id.*

51.     Unlike the funds securing the Revenue Bonds, the funds belonging to COFINA are to be "directly deposited in FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico." *Id.* The funds are first deposited in an account held by COFINA at Banco Popular de Puerto Rico, and are subsequently transferred to a trust account maintained at Bank of New York Mellon, the COFINA Trustee. Under the COFINA Resolution, COFINA pledged its property interest in the SUT Revenues to the COFINA Trustee for the payment of, and as security for, any bonds issued by COFINA.

52.     The statute further provides that the SUT Revenues shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico." *Id.* Not only were COFINA's creditors given this stark statutory assurance, but GO bondholders were likewise warned that the SUT Revenues would not be available to cover payment of GO debt in the event of a fiscal year shortfall or any other circumstance. The Official Statements for GO Bonds expressly disclose to potential purchasers that, under Puerto Rico law, the SUT Revenues belonging to COFINA "do not constitute 'available resources' of the Commonwealth" and that such funds are therefore "not available for the payment of principal of and interest on the [GO] Bonds." Ex. D at 28.

53.     Importantly, bonds issued by COFINA do "not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities" and are not backed by a pledge of the Commonwealth's full faith, credit, and taxing power. 13 L.P.R.A. § 13(d). Rather,

COFINA's bonds are payable solely from the revenue stream belonging to COFINA under its enabling legislation or any similar or comparable security that may be substituted in accordance therewith.

54.    In COFINA's enabling legislation and the COFINA Resolution, the Commonwealth expressly covenanted and agreed that it would not limit or restrict the rights granted by the enabling legislation to enable COFINA to meet its obligations to bondholders. *See* 13 L.P.R.A. § 14(c); Ex. C § 706.  COFINA likewise covenanted to "defend, preserve and protect" the COFINA structure and the rights of COFINA's creditors against any challenge to the COFINA structure.  *See* Ex. C § 705.

## IV.    Ambac Issues Financial Guaranty Insurance on Certain Senior COFINA Bonds

55.    In 2007, COFINA issued approximately $2.7 billion in senior capital appreciation bonds ("CABs") and current interest bonds.  Ambac agreed to insure senior CABs in a face amount of $808.5 million at issuance.  The current net accreted value of the CABs insured by Ambac is approximately $1.3 billion.

56.    In exchange for its agreement to insure these CABs, Ambac negotiated for certain special consent rights.  Specifically, under the applicable bond insurance agreement, Ambac's consent is required ***in addition to*** bondholder consent for any action requiring such consent. Such actions include any amendments or other modifications to the COFINA Resolution, which would require the consent of a majority in principal amount of the COFINA bonds outstanding.

## V.    The Puerto Rico Oversight, Management, and Economic Stability Act

57.    On June 30, 2016, in response to the Commonwealth's financial and economic difficulties, President Obama signed PROMESA into law.  PROMESA established the Oversight Board.  *See* 48 U.S.C. § 2121(b)(1).  PROMESA also provided for an out-of-court, voluntary

restructuring process ("Title VI"), *see id.* §§ 2231-2232, and a court-supervised restructuring process akin to Chapter 9 of the Bankruptcy Code ("Title III"), *see id.* §§ 2161 et seq.

### A.    The Oversight Board

58.    The Oversight Board consists of seven members, all of whom were appointed by President Obama on August 31, 2016.  "The purpose of the Oversight Board is to provide a method for [the Commonwealth] to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a).  To effect these purposes, the Oversight Board is charged with approving and certifying nearly all actions of the Commonwealth relating to its finances.

### B.    Title VI

59.    Title VI of PROMESA, entitled "Creditor Collective Action," allows municipal issuers of debt to restructure those debts through a largely out-of-court process requiring the consent of most of the issuer's creditors.  The Title VI process requires a municipal issuer of debt to submit proposed modifications to the terms of its debt to holders of that debt for a vote of approval.  The voting process involves the classification of the issuer's debt into "pools" of similar debt.  Although all pools must consent to the proposed modification for it to become binding, unanimous approval within each pool is not required.  In this way, Title VI allows an issuer to bind holdout creditors if a significant majority of its creditors have consented to modify their debt, all without having to participate in a court-supervised restructuring process.

### C.    Title III

60.    Title III of PROMESA, entitled "Adjustments of Debts," enables the Oversight Board to file a petition to restructure its debts in a court-supervised process similar to Chapter 9 of the Bankruptcy Code.  Several key differences separate Title III from Chapter 9.  Chief among them is the prominent role of the Oversight Board, which performs many of the key functions of a Chapter 9 debtor.  Whereas in Chapter 9, a debtor may file its own restructuring petition and

submit its own plans of adjustment, only the Oversight Board may file a Title III petition (48 U.S.C. § 2164(a)), a plan of adjustment (*id.* § 2172), or any modification thereto (*id.* § 2173).

### D.    **PROMESA Preemption**

61.     In addition to the establishment of the Oversight Board, PROMESA expressly preempts certain territory-level legislative and executive acts.  Modeled on Section 903 of the Bankruptcy Code, Section 303 of PROMESA first provides that no territory moratorium law nor other territory law "prescribing a method of composition of indebtedness" may bind non-consenting creditors to the extent that such laws "prohibit payment of principal or interest."  48 U.S.C. § 2163(1).  PROMESA further preempts "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory."  *Id.* § 2163(3).  Finally, Section 407 of PROMESA makes transferees of funds transferred from a Commonwealth instrumentality to the Commonwealth in violation of applicable law liable for the value of that transfer.

## VI.    **The Fiscal Plan**

62.     Section 201 of PROMESA requires that the Commonwealth submit to the Oversight Board a fiscal plan.  48 U.S.C. § 2141.

63.     PROMESA provides that a fiscal plan "shall . . . provide a method to achieve fiscal responsibility and access to the capital markets," and shall satisfy fourteen additional requirements.  48 U.S.C. § 2141(b)(1).

64.     These additional requirements include, as are relevant here, that the fiscal plan shall:

> (M) ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a

covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI; and

(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

*Id.* § 2141(b)(1)(M), (N).

65. The Oversight Board may not certify a fiscal plan unless it meets all the requirements laid out in the statute. *See id.* § 2141(c)(3)(A).

66. Once certified, the fiscal plan forms the basis for all actions taken and all determinations made by the Oversight Board, including certifications and actions related to restructuring in both Title VI and Title III. Compliance with the fiscal plan is the overarching guidepost governing the Oversight Board's responsibilities under PROMESA.

- ***Budgeting.*** All budgets must be approved by the Oversight Board. One criterion for the Oversight Board's approval is the budget's compliance with the fiscal plan. *See* 48 U.S.C. § 2104(6)(B) (definition of "compliant budget").

- ***Title VI.*** The Oversight Board generally must certify that all proposed modifications are consistent with the fiscal plan before the modifications may be submitted to the pools for voting. *See id.* §§ 2124(i), 2231(g). The Oversight Board must also certify that an approved modification is consistent with the fiscal plan before it may become binding. *See id.* §§ 2124(i), 2231(m)(1)(B)(ii).

- ***Title III.*** In order for the Oversight Board to file a restructuring petition for any entity, the Oversight Board must certify that there is a fiscal plan in place. *See id.* §§ 2146(a)(3), 2162(2). The Oversight Board must also certify that any plan of adjustment it submits, and any modifications it makes thereto, are consistent with the fiscal plan. *See id.* § 2124(j). Consistency with the fiscal plan is also an independent confirmation requirement: In order for the plan to be confirmed, the United States District Court for the District of Puerto Rico must make a finding that the plan of adjustment is consistent with the fiscal plan. *See id.* § 2174(b)(7).

- ***Review of newly enacted laws.***  The Oversight Board may review (and, unless the Board requires otherwise, the Governor is required to submit to the Oversight Board) all laws enacted for consistency with the fiscal plan.  If the Oversight Board is not satisfied that the law is consistent with the fiscal plan, the Oversight Board may prevent the enforcement or application of the law.  *See id.* § 2144(a).

- ***Review of newly issued executive orders, rules, and regulations.***  The Oversight Board may review any proposed rules, regulations, or executive orders of the Governor for consistency with the fiscal plan.  If the government fails to adopt the Oversight Board's recommendations concerning changes to ensure consistency with the fiscal plan, the Oversight Board may prevent enforcement or execution of the executive order, rule, or regulation.  *See id.* § 2144(b)(4).

- ***Review of proposed government contracts.***  The Oversight Board may review certain contracts the government proposes to execute for consistency with the fiscal plan.   If the government fails to adopt the Oversight Board's recommendations concerning changes to ensure consistency with the fiscal plan, the Board may prevent enforcement or execution of the contract.  *See id.* § 2144(b).

- ***Recommendations to the Commonwealth government.***  The Oversight Board may, at any time, make recommendations to the government to ensure compliance with the fiscal plan.  In the event the government refuses to adopt the recommendations, the government must submit its reasons for refusing the recommendation to the President and Congress.  *See id.* § 2145.

## VII.    The Government of Puerto Rico Proposes, and the Oversight Board Certifies, a Fiscal Plan

67.    On January 2, 2017, Governor Rosselló was sworn in as the 12th Governor of Puerto Rico.

68.    On January 18, 2017, AAFAF, a Commonwealth agency created by the Puerto Rico Legislative Assembly in April 2016 to act as the Commonwealth's fiscal agent, financial advisor, and reporting agent, was assigned responsibility for representing the Commonwealth and its public corporations or instrumentalities in any restructuring discussions with creditors of the Commonwealth and/or its instrumentalities and with the Oversight Board.

69.    The appointment of AAFAF constituted a modification to the COFINA Resolution that required the consent of Ambac in addition to holders of a majority of principal

amount of COFINA bonds outstanding.  At no time did the Commonwealth or COFINA seek such consent.

70.     On February 28, 2017, the Rosselló administration and AAFAF submitted an initial fiscal plan (the "February 28 Fiscal Plan") to the Oversight Board.

71.     On March 9, 2017, the Oversight Board rejected the February 28 Fiscal Plan on the ground that it understated the Commonwealth's expenditures.

72.     On March 11, 2017, the Rosselló administration and AAFAF submitted a revised fiscal plan (the "Fiscal Plan").  As compared to the February 28 Fiscal Plan, the revised version increased payroll expenses by more than $1.5 billion and operational expenses by more than $400 million over a ten-year period.  *See* Ex. A at 11.  The Fiscal Plan devoted $7.87 billion to debt service over the ten-year period from 2017 through 2026—an average of $787 million per year.  *See id.* at 28.

73.     In total, the Commonwealth or the instrumentalities covered by the Fiscal Plan owe bondholders just over $30.0 billion between FY2018 and FY2026.  *See id.* at 27. Accordingly, the total of $6.79 billion allocated in the Fiscal Plan to debt service across the same period represents a ***77.4% impairment of the applicable debt obligations***.  *See id.* at 27-28.

74.     On March 13, 2017, two days after the Fiscal Plan was submitted, the Oversight Board certified the Fiscal Plan.

## VIII.  The Commonwealth Passes and the Governor Signs the Fiscal Plan Compliance Law

75.     Late in the evening on April 27, 2017, Puerto Rico's House of Representatives and Senate passed identical versions of the Fiscal Plan Compliance Law.  The Governor signed the legislation into law on April 29, 2017.

76.    As indicated by its title, the Fiscal Plan Compliance Law purports to operationalize the mandate set forth in the Fiscal Plan.  Indeed, following passage of the Fiscal Plan Compliance Law, Defendant Sánchez, the Governor's representative on the Oversight Board, stated that the statute was "very consistent" with the Fiscal Plan.  At the center of the statute are provisions that unlawfully appropriate the SUT Revenues belonging to COFINA for the Commonwealth's general purposes.

77.    Specifically, Chapter 4 of the Fiscal Plan Compliance Law provides that all public corporations, including COFINA, shall transfer any revenue "surpluses" to the Commonwealth Treasury, and that such funds shall be considered "available revenues" for the Commonwealth and would be deposited in the General Fund to meet the liquidity requirements contemplated in the Fiscal Plan.  *See* Ex. B at 116.

78.    Chapter 6 of the Fiscal Plan Compliance Law further requires that all public corporations, including COFINA, deposit their funds with the Commonwealth Treasury, whether "surplus" funds or otherwise.  *See id.* at 127.  While Chapter 6 pays lip service to lawful priorities, stating that "[s]aid funds will continue to be used for those purposes for which they were assigned by Law or in the Fiscal Plan," the Fiscal Plan itself allocates revenues in a manner that is contrary to law (including by treating the SUT Revenues belonging to COFINA as General Fund revenues).  *See id*. at 128.  More importantly, Chapter 6 provides that funds deposited in the General Fund will be allocated "in the order of priority determined by the Secretary [of the Treasury]."  *See id.* at 127.  Implicitly acknowledging the inconsistency of these provisions with preexisting legislation, including COFINA's enabling legislation, Chapter 6 provides that "[i]f there is any inconsistency between the law or a contract with the Fiscal Plan, the purpose set forth in the Fiscal Plan approved in accordance with the provisions of the

PROMESA Federal Law will prevail." *See id.* at 128.  Put differently, Chapter 6 purports to authorize the Secretary of the Treasury, apparently in his sole discretion, to apply the SUT Revenues "in the order of priority" he deems appropriate, regardless of the actual payment priorities under applicable law.

79.    Although the Fiscal Plan Compliance Law purports to limit the circumstances under which the SUT Revenues can be clawed back, this supposed protection is entirely illusory. Chapter 4 provides that the Commonwealth may "use COFINA funds in an occasional manner solely as the last alternative" and subject to a sworn certification by the heads of AAFAF and OMB concerning "the need, timeline and funds to be used to cover an occasional significant deficit in cash flow to comply with the Puerto Rico government's fiscal plan." *See id.* at 119. But this reference to an "occasional significant deficit in cash flow" that would need to be filled in order to comply with the Fiscal Plan does not erase the fact that the Fiscal Plan by its terms *guarantees* that SUT Revenues will be used to fund the contemplated expenditures.

80.    For example, in fiscal year 2018, the Fiscal Plan allocates $404 million to all debt service. *See* Ex. A at 28.  But the total debt service owing on COFINA alone in fiscal year 2018 is $709 million, not to mention the $1.07 billion owing on GO debt and hundreds of millions owing on Revenue Bonds and other bonds. *See* Ex. A at 27.  Thus, even if the entirety of the $404 million allocated for debt service were applied solely to COFINA,[2] an incremental $305 million in SUT Revenues that constitute COFINA's property would be applied to other expenditures.  Far from being used "in an occasional manner solely as the last alternative," the Fiscal Plan effectively requires that the SUT Revenues be applied to other expenditures on an

---

[2] The Commonwealth has made clear that it does *not* intend to apply all of the $404 million to COFINA, as the Title VI proposal it publicly disclosed on April 28, 2017 treats COFINA, incorrectly, as subordinate to GO debt.  *See infra* ¶¶ 83-85.

uninterrupted basis for the full 10-year period covered by the certified Fiscal Plan.  And there is no reason to believe that it would be different thereafter.

81.    Using COFINA property for Commonwealth purposes is directly at odds with COFINA's enabling legislation, which provides unequivocally that the SUT Revenues shall be deposited directly in the FIA and outside the control of the Commonwealth, and that such funds shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."  13 L.P.R.A. § 12.

82.    Just as blatantly, the Fiscal Plan Compliance Law violates the Commonwealth's statutory and contractual commitment not to "limit or restrain the powers hereby conferred by [COFINA's enabling legislation] or the rights of COFINA to meet its agreements with bondholders" until the COFINA bonds are repaid in full.  13 L.P.R.A. § 14(c); Ex. C § 706.  COFINA has likewise violated its covenant under the COFINA Resolution to "defend, preserve and protect" the COFINA structure and the rights of COFINA's bondholders against any challenges to the structure.  *See* Ex. C § 705.  As a result, and as conveyed in a letter sent by Ambac to COFINA and the Commonwealth substantially simultaneously with the filing of this Complaint, there has been a "failure to observe, or a refusal to comply with, the terms of the Resolution" and therefore an Event of Default as defined thereunder.  *See* Ex. C § 1101(1)(ii).

83.    As if the Fiscal Plan Compliance Law were not a clear enough repudiation of the Commonwealth's decade-long commitment to COFINA, the day after the statute's passage in the Legislative Assembly, AAFAF publicly disclosed a proposed Title VI plan of adjustment (the "Proposal").

84.     As a matter of process, AAFAF's move in proposing a restructuring of COFINA's debt—in the face of a bond resolution that expressly required COFINA to "defend, preserve and protect" bondholders' rights—was a startling display of bad faith and contempt for the consent rights for which Ambac negotiated in the applicable financial guaranty insurance policy.  Section (b) of the Special Provisions Relating to Bond Insurance Policies specifically requires COFINA to obtain Ambac's consent for the "initiation or approval of any action . . . which requires bondholder consent."  Initiating a potential restructuring of COFINA debt by publicizing the Proposal without Ambac's consent was a clear violation of this right.

85.     As a matter of substance, the Proposal further illustrates the Commonwealth's breach of its statutory and contractual commitments.  First, the Proposal would confiscate the SUT Revenues belonging to COFINA and use them to pay junior obligations, including ordinary operating expenses, while paying COFINA's bondholders only 58 cents on the dollar—nearly half of it consisting of "cash flow" bonds of highly questionable value.  Second, it would use the same SUT Revenues to pay GO bonds at a significantly higher rate of recovery (approximately 77 cents on the dollar).  Third, the Proposal would treat COFINA's senior and subordinate claims *pari passu*, notwithstanding the COFINA Resolution's clear terms that, in an event of default, holders of COFINA's subordinate bonds are not to receive any distributions until senior bondholders have been paid in full.  Ex. C § 1101(1)(ii).  Finally, the Proposal advances a coercive "death trap" mechanism, unauthorized by PROMESA, that offers even lower recoveries to COFINA creditors if they do not accept the Proposal's *pari passu* treatment and 42% impairment (with half of the consideration of highly questionable value).  Were COFINA creditors to reject the Proposal, senior COFINA bonds would receive short-term notes of $450 million in face amount worth only *2.6%* of the outstanding COFINA obligations.  Consistent

with the Commonwealth's prior behavior, the Proposal makes a mockery of PROMESA's requirement that the Fiscal Plan and any restructuring plans premised thereon "respect the relative lawful priorities and lawful liens" under Commonwealth law.    48 U.S.C. § 2141(b)(1)(N).    Far from respecting the lawful priorities, the Fiscal Plan and the Proposal entirely disrespect all lawful liens and priorities.

IX.    **The Fiscal Plan and the Fiscal Plan Compliance Law Impair the COFINA Structure**

86.    In addition to imposing draconian, unilateral cuts to the debt obligations of the Commonwealth and its instrumentalities, including COFINA, the Fiscal Plan and the Fiscal Plan Compliance Law fundamentally impair the COFINA structure in a number of respects.

87.    First, the Fiscal Plan and the Fiscal Plan Compliance Law fail to distinguish between General Fund revenues and the SUT Revenues belonging to COFINA.  The Fiscal Plan treats the entirety of the sales and use tax, including the percentage that was made COFINA's property and required to be segregated from the General Fund by statute in 2006, as if it is a general Commonwealth revenue source flowing through the General Fund.  *See* Ex. A at 11. The Fiscal Plan Compliance Law then purports to put into effect the unlawful assumption of the Fiscal Plan—that the SUT Revenues belong to the Commonwealth instead of COFINA and can simply be taken from COFINA—by requiring that all funds generated by Commonwealth legislation flow directly into the General Fund, to be disbursed according to priorities determined by the Secretary of the Treasury.

88.    The diversion of the SUT Revenues to the General Fund is not an accidental byproduct of the Fiscal Plan—it was consciously intended by the Oversight Board in certifying the Fiscal Plan.  Media sources have quoted Defendant Sánchez, an *ex officio* member of the Oversight Board and representative of the Commonwealth government, as stating forthrightly

that ***"[t]he Fiscal Plan is conceptualized in the idea that all revenues of the government will now go to a single fund (contrary to what occurs now with COFINA)."***

89.     Thus, the Fiscal Plan itself, and the Fiscal Plan Compliance Law that flows from it, deliberately strike at the heart of the COFINA structure—the statutory segregation of COFINA's property.  They do so in derogation of PROMESA itself, which requires that the Fiscal Plan "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory . . . unless permitted by the constitution of the territory, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI" (48 U.S.C. § 2141(b)(1)(M)), and that it "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act" (*id.* § 2141(b)(1)(N)).   By engaging in this unlawful conduct, Defendants have affirmatively undermined the very structure that enabled the Commonwealth to access the capital markets on affordable terms in the midst of an urgent financial and economic emergency, and on which Ambac and other creditors relied.

90.     Second, the Fiscal Plan and the Fiscal Plan Compliance Law compound the error by making COFINA and other debt obligations junior to all other expenses.  The Fiscal Plan's purported "debt sustainability" analysis reduces to an unsubstantiated enumeration of its ***non-debt related*** expenses, an equally unsubstantiated projection of revenues, and a conclusion that whatever money is left over should be devoted to debt service.  Indeed, the Oversight Board has expressly admitted in a letter to Congress dated April 25, 2017 that the Fiscal Plan's purported debt sustainability analysis starts by computing all revenues and expenditures "and then computes the funds available for debt service."  Ex. E at 3.

91.    This approach turns Puerto Rico law on its head.    Under COFINA's enabling legislation, the SUT Revenues belonging to COFINA are not allowed to be used for any purpose whatsoever other than to repay COFINA's bonds—*i.e.*, they are not resources available to the Commonwealth and thus should not be factored into estimates of Puerto Rico's General Fund revenues at all.    This structure is contemplated by the Puerto Rico Constitution, which acknowledges that not all funds generated by Commonwealth legislation will be "covered into the Puerto Rico Treasury" (P.R. Const. art. VI, § 2), and limits the GO Priority to revenues available to the Commonwealth (*id.* § 8).    Further, under the Puerto Rico Constitution and the OMB Act, GO Bonds and Revenues Bonds receive first and second priority, respectively, to the resources available to the Commonwealth.    But under the logic of the Fiscal Plan, all of the affected debt, including that issued by COFINA, is treated as subordinate to each and every expense expected to be incurred by the Commonwealth over the next ten years.

92.    Finally, the Fiscal Plan and the Fiscal Plan Compliance Law accomplish this inversion of the priority scheme established by Puerto Rico law without even purporting to rely on the Commonwealth's police power or to define what would constitute "essential services." Indeed, the Fiscal Plan expressly ***disclaims*** any attempt to advance such a definition, taking either the untenable position that ***all expenses*** are for essential services, or the equally untenable position that COFINA's SUT Revenues (which cannot be used for ***any*** Commonwealth expenses) and monies necessary to repay GO Debt or pledged to the Revenue Bonds (both of which have constitutional and statutory priority) can be applied to non-essential services.    Setting aside whether invocation of the police power can be used to justify impairment of the debt obligations of COFINA, the Commonwealth, or PRIFA, PRHTA, and PRCCDA (a point Ambac

does not accept or concede), Defendants have not even *attempted* to advance such a justification. They have simply taken COFINA's (and other issuers') money.

X.    **The Fiscal Plan and the Fiscal Plan Compliance Law Have Injured Ambac**

93.    Defendants' diversion of the SUT Revenues from the payment of the COFINA bonds has caused and will cause further injury to Ambac because it reduces the amount of SUT Revenues securing the payment of the COFINA bonds. By effectively confiscating COFINA's property (its sole means of repaying its bonds) and the COFINA bondholders' collateral, Defendants' actions have guaranteed defaults on the COFINA bonds in the short- and long-term, including the COFINA CABs insured by Ambac, which will result in inevitable payments on Ambac's insurance policy.

94.    Furthermore, whether as a result of claims of sovereign immunity or an alleged inability to pay any award of damages, Ambac and the COFINA bondholders have no adequate remedy at law against Defendants in the event that Defendants' unconstitutional diversion of the SUT Revenues results in payment defaults on the COFINA bonds. Accordingly, the only recourse that is available to Ambac and to the COFINA bondholders in order to prevent an irreparable injury is to obtain injunctive relief enjoining Defendants' unconstitutional diversion of the SUT Revenues prior to the time that this unconstitutional diversion results in defaults.

95.    The Oversight Board itself has acknowledged that, by aggregating the SUT Revenues belonging to COFINA into the full stream of General Fund revenues, the Fiscal Plan deliberately purports to make those monies available for uses other than repayment of the COFINA bonds, in plain violation of COFINA's enabling legislation. Ambac never agreed to insure against such a liability.

**XI.**    **The Fiscal Plan and the Fiscal Plan Compliance Law Violate The Contracts Clause**

96.    The Contracts Clause provides, in pertinent part, "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  U.S. Const., art. I, § 10, cl. 1.  The primary purpose behind the enactment of the Contracts Clause was to prevent States from adopting laws that would permit borrowers (including the States) to abrogate their debts at the expense of creditors.  *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427-28 (1934); *Antoni v. Greenhow*, 107 U.S. 769, 795 (1883).

97.    The Fiscal Plan and the Fiscal Plan Compliance Law substantially impair the contractual rights of Ambac and the COFINA bondholders.  The COFINA bondholders purchased the COFINA bonds (and Ambac issued its insurance policies for those bonds) in reliance on COFINA's *and the Commonwealth's* promise that the SUT Revenues would be used exclusively for the payment of the COFINA bonds—*with no exceptions* (as compared to, for example, the clawback exception for the Revenue Bonds).  This feature was incorporated into COFINA's contracts with the COFINA bondholders and with Ambac.  By altering these priorities and diverting the SUT revenues from their contractually-required purposes, the Fiscal Plan and the Fiscal Plan Compliance Law substantially impair the contractual rights of the COFINA bondholders and Ambac to be secured by, and ultimately paid from, the SUT Revenues.

98.    All of the foregoing unlawful conduct was accomplished through either a direct or delegated exercise of legislative power:

- in submitting the Fiscal Plan, the Governor, the Secretary of the Treasury, and AAFAF exercised the powers delegated to them by Act No. 21 of 2016, Act No. 2 of 2017, and Act No. 5 of 2017;

- in certifying the Fiscal Plan, the Oversight Board exercised the powers delegated to it by Section 201 of PROMESA; and

- in passing the Fiscal Plan Compliance Law, the Commonwealth's Legislative Assembly directly exercised its legislative power.

99. Defendants' diversion of the SUT Revenues pursuant to the Fiscal Plan and the Fiscal Plan Compliance Law is not a necessary or reasonable means of serving an important public purpose, because less drastic alternatives are available that would not entail an impairment of the COFINA structure.

100. First, the Fiscal Plan dramatically understates the resources available to the Commonwealth. The Commonwealth's tax collections and other government revenues have been rising steadily since 2011, and are at all-time highs. *See* Commonwealth Financial Information and Operating Data Report, December 18, 2016, at 160. Notwithstanding this steady growth in the revenue base, the Fiscal Plan takes the fiscal year 2017 projections, ***not*** actual revenues, as the base metric for all future years through 2026 (*see* Ex. A at 28)—projections which have already been shown to understate the resources available to the Commonwealth.

101. Second, the Fiscal Plan, while failing to engage in any substantive debt sustainability analysis, only allocates $787 million in average annual debt service across all obligors, which amounts to 4.3% of the average Commonwealth revenues projected for the same period. *See id.* This ratio is not only substantially below debt service levels in other states, cities, and countries (including countries whose economies are less developed than Puerto Rico's), but also less than half of what the framers of the Puerto Rico Constitution deemed sustainable ***for GO debt alone***. *See* P.R. Const. art. VI, § 2 (imposing ceiling for debt backed by the "full faith, credit, and taxing power of the Commonwealth" of 15% of average amounts "covered into the Treasury of Puerto Rico" in two preceding fiscal years). For example, debt service amounts to 14.5% of net revenues in Illinois, 16.8% in New Hampshire, 18.9% in

Massachusetts, and 20.8% in Rhode Island.[3]  This level of debt service is also sustained in large cities:  A recent report found that "major rating agencies have advised that [New York City] should devote no more than 17 percent of its tax revenue . . . to debt service.  Generally, the City's debt service takes up around 15 percent of tax revenue, but it is projected to take up an increasing share in the coming years."[4]  Debt service levels for sovereign borrowers fall in similar or higher ranges, with recent statistics showing 14.6% of total revenues devoted to debt service in the Bahamas, 14.4% in Grenada, and 26.2% in Jamaica.[5]  Further, World Bank and International Monetary Fund guidelines provide that 18% to 22% of government revenues is a sustainable debt service ratio level even for "low income countries."  In fact, the guidelines conclude that a debt service ratio of 22% is "strong policy" for a low income country.[6]

102.    Third, although the Oversight Board has suggested that the Fiscal Plan will create 34% in overall savings after five years (*see* Ex. E at 8), these purported "savings" are calculated by reference to the Fiscal Plan's projected spending levels, which are well above current levels— an accounting sleight of hand designed to mask that the Commonwealth's expenditures actually **increase** over the ten-year period covered by the Fiscal Plan (*see* Ex. A at 12).

103.    Fourth, and most egregious of all, the Fiscal Plan includes a "reconciliation adjustment"—in truth, a cash cushion—totaling $6.2 billion over the decade covered by the Fiscal Plan, or approximately $620 million per year.  *See* Ex. A at 12, 14.  The Fiscal Plan does

---

[3]  *See CivicDashboards*, OPENGOV (last visited April 29, 2017), http://www.civicdashboards.com /state/rhode-island-04000US44/debt_service_ratio.

[4]  *See* How to Save New York City's Infrastructure: Dedicate Revenues, New York Building Congress (November 2013), https://www.buildingcongress.com/research/infrastructure/01.html.

[5]  *See Interest payments (% of revenue)*, THE WORLD BANK (last visited April 29, 2017), http://data.worldbank.org/indicator/GC.XPN.INTP.RV.ZS.

not attempt to explain what this annual $620 million cushion would be allocated to.  Rather, the Oversight Board justifies the cushion on the theory that actual expenditures in the past were understated by the Commonwealth, and thus will continue to be understated over the next ten years.  Indeed, the Fiscal Plan assumes that this supposed understatement of expenditures not only will continue over the next ten years, but that the annual amount of the understatement will *grow* by approximately 12% from $585 million to $657 million during that period.  *See id.*  This "reconciliation adjustment" represents a complete abdication of the Oversight Board's primary mandate—to restore fiscal responsibility and thereby facilitate access to the capital markets—by assuming ongoing unaccounted-for expenditures and implicitly acknowledging that the Oversight Board will never succeed in getting a handle on such expenditures.  Instead, the Fiscal Plan requires the Commonwealth's creditors to fund a $6.2 billion cushion to *enable* those expenditures.

104.    In short, the Fiscal Plan—and the Fiscal Plan Compliance Law that seeks to effectuate the Fiscal Plan—constitute neither a reasonable nor a necessary means of serving an important public purpose, because those acts *subvert* important public interests, many less drastic alternatives existed that would actually benefit the public, and their ultimate effect will be only to impede a consensual resolution to the Commonwealth's debt problems, to limit the Commonwealth's access to the capital markets, to deepen the Commonwealth's long-term financial difficulties, and to endanger the long-term health and safety of the people of Puerto Rico.

---

[6] *See Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income Countries*, INTERNATIONAL MONETARY FUND (March 2016), http://www.imf.org/external/np/exr/facts/pdf/jdsf.pdf.

XII.   **The Fiscal Plan and the Fiscal Plan Compliance Law Violate The Takings And Due Process Clauses**

105.   The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the United States Constitution.  U.S. Const. amend. XIV, § 1.

106.   The Due Process Clauses forbid the Commonwealth from depriving "any person . . . of life, liberty, or property, without due process of law."  U.S. Const. amends. V, XIV, § 1.

107.   The Fiscal Plan and the Fiscal Plan Compliance Law violate the Takings and Due Process Clauses by depriving Ambac and the COFINA bondholders of their senior secured property interests in the SUT Revenues without providing Ambac and the COFINA bondholders with just compensation or due process of law.  Neither the GO Priority nor any other provisions of Puerto Rico law provide a legal basis for the Governor, AAFAF, or the Oversight Board to deprive Ambac and the COFINA bondholders of their property interests in the SUT Revenues.  Accordingly, the Fiscal Plan and the Fiscal Plan Compliance Law constitute an unconstitutional taking and a violation of Ambac's and the COFINA bondholders' due process rights.

IX.   **The Fiscal Plan and Fiscal Plan Compliance Law Are Expressly Preempted by Section 303 of PROMESA**

108.   Section 303(3) of PROMESA preempts unlawful executive orders.  Specifically, Section 303(3) of PROMESA provides that:

> unlawful executive orders that alter, amend, or modify rights of holder of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act.

48 U.S.C. § 2163(3).

109.    The Fiscal Plan constitutes an executive order because it was developed and submitted by AAFAF at the direction and with the oversight of the Governor.

110.    As demonstrated above (*see supra* ¶¶ 96-107), the Fiscal Plan violates the Contracts Clause and the Takings and Due Process Clauses of the U.S. Constitution, and is accordingly an unlawful executive order.

111.    The Fiscal Plan is therefore preempted by Section 303(3) of PROMESA.

112.    Section 303(1) of PROMESA also preempts laws of the Commonwealth that prescribe methods of composition of indebtedness.  Specifically, Section 303(1) of PROMESA provides that:

> a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of title 11, United States Code, may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium[.]

48 U.S.C. § 2163(1).

113.    The Fiscal Plan Compliance Law diverts COFINA's pledged assets to the Commonwealth and prescribes a method of composition for COFINA's indebtedness without COFINA bondholders' consent.  Specifically, the Fiscal Plan Compliance Law allows the Secretary of Treasury to use COFINA's assets—the SUT Revenues—without regard for the liens held by COFINA's bondholders or COFINA's ability to continue to make debt service payments on its bonds.  And the Secretary of Treasury is purportedly authorized to use the SUT Revenues to pay other, junior obligations before COFINA's bondholders, without the consent of those bondholders.

114.    The Fiscal Plan Compliance Law is therefore preempted by Section 303(1) of PROMESA.

X.    **The Fiscal Plan and the Fiscal Plan Compliance Law Violate Section 407 of PROMESA**

115.    Section 407 of PROMESA, entitled "Protection From Inter-Debtor Transfers," provides:

> (a) Protection of Creditors.—While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property.

48 U.S.C. § 2195(a).

116.    An Oversight Board is currently in existence for Puerto Rico.

117.    The Fiscal Plan and the Fiscal Plan Compliance Law violate Section 407 of PROMESA in multiple respects.

118.    First, the Fiscal Plan and the Fiscal Plan Compliance Law effect a transfer of COFINA's property—the SUT Revenues—to the Commonwealth.  As set forth above, that transfer violates applicable law under which the COFINA bondholders have a valid property interest and pledge—namely, the COFINA enabling legislation.  Pursuant to those statutes, the SUT Revenues are not "available resources" of the Commonwealth and may ***under no circumstances*** be clawed back to pay GO debt, much less to pay obligations that are legally subordinate to GO debt.  Yet the Fiscal Plan and the Fiscal Plan Compliance Law require precisely that, using the SUT Revenues to finance not only payments of subordinate debt obligations, but also operating expenses that are explicitly junior to those debt obligations.

119.    Second, the Fiscal Plan and the Fiscal Plan Compliance Law deprive COFINA of property in violation of COFINA's enabling legislation, which assures the transfer of such

property directly to COFINA for the benefit of its creditors.  Thus, the Fiscal Plan and the Fiscal Plan Compliance Law violate both aspects of Section 407 of PROMESA.

120.    As transferee of funds unlawfully transferred in connection with the Fiscal Plan and the Fiscal Plan Compliance Law, the Commonwealth is liable to Ambac and the COFINA bondholders for the full value of the funds transferred to the Commonwealth.

121.    Section 407 of PROMESA also creates both a private right of action against the Commonwealth for any transfers it receives, and concurrently waives the Commonwealth's sovereign immunity with respect to such transfers.  This is evident from the face of Section 407, which does not exclude the Commonwealth from liability under it, despite the fact that clawback by definition diverts money to the Commonwealth and indeed was well underway when PROMESA was being debated and signed into law.  Congress has the power to implicitly or explicitly waive the Commonwealth's ability to raise the defense of sovereign immunity under its plenary Territorial Clause powers.  *See* U.S. Const. Art. IV, Sec. 3; PROMESA § 101(b)(2) ("Congress enacts this Act pursuant to article IV, section 3 of the Constitution of the United States, which provides Congress the power to dispose of and make all needful rules and regulations for territories.").  Moreover, if the Commonwealth's sovereign immunity was not waived, then Section 407 would be rendered meaningless—because the Commonwealth could receive an unlimited amount of illegal transfers with absolute impunity.

## FIRST CLAIM FOR RELIEF

**(For Declaratory And Injunctive Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of The Contracts Clause Against All Defendants)**

122.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 121 hereof, as if fully set forth herein.

123.    The certification of the Fiscal Plan and the enactment, issuance, and implementation of the Fiscal Plan Compliance Law have harmed Ambac and the COFINA bondholders by diverting funds contractually pledged to secure the payment of the COFINA bonds to other purposes.

124.    An actual justiciable controversy exists between the parties.

125.    Ambac is entitled to an order declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Contracts Clause of Article I of the U.S. Constitution; (ii) that the Fiscal Plan and the Fiscal Plan Compliance Law each unlawfully interfere with and impede Ambac's contractual rights; and (iii) that the Fiscal Plan and the Fiscal Plan Compliance Law are unlawful, invalid, null, and void.

126.    If the Fiscal Plan and the Fiscal Plan Compliance Law are enforced, and Defendants act pursuant to each to divert the SUT Revenues from payment of the COFINA bonds to other purposes, such diversion will result in imminent and irreparable harm to Ambac and the COFINA bondholders by reducing the amount of collateral securing the COFINA bonds and causing payment defaults on the COFINA bonds.

127.    In addition, enforcement of the Fiscal Plan and the Fiscal Plan Compliance Law will cause immediate and irreparable harm by substantially impairing Ambac's and the COFINA bondholders' contractual interests in a manner that violates the Contracts Clause of Article I of the U.S. Constitution.

128.    Ambac is entitled to an injunction prohibiting Defendants from taking or causing to be taken any action pursuant to the Fiscal Plan and the Fiscal Plan Compliance Law.

## SECOND CLAIM FOR RELIEF

**(For Declaratory And Injunctive Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of The Takings And Due Process Clauses Against All Defendants)**

129.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 128 hereof, as if fully set forth herein.

130.    The certification of the Fiscal Plan and the enactment, issuance, and implementation of the Fiscal Plan Compliance Law have harmed Ambac and the COFINA bondholders by (i) taking or causing to be taken funds in which Ambac and the COFINA bondholders hold a property interest without providing Ambac and the COFINA bondholders with just compensation, and (ii) depriving Ambac and the COFINA bondholders of funds in which Ambac and the COFINA bondholders hold a property interest without due process of law.

131.    An actual, justiciable controversy exists between the parties.

132.    Ambac is entitled to an order declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Fifth and Fourteenth Amendments of the U.S. Constitution; and (ii) that the Fiscal Plan and the Fiscal Plan Compliance Law are unlawful, invalid, null, and void.

133.    If the Fiscal Plan and Fiscal Plan Compliance Law are enforced, and Defendants act pursuant to each to take or cause to be taken SUT Revenues in which Ambac and the COFINA bondholders hold a property interest and deprive Ambac and the COFINA bondholders of access to such SUT Revenues, such taking will result in imminent and irreparable harm to Ambac and the COFINA bondholders by reducing the amount of collateral securing the COFINA bonds and causing payment defaults on the COFINA bonds.

134.    In addition, enforcement of the Fiscal Plan and the Fiscal Plan Compliance Law will cause immediate and irreparable harm by depriving Ambac and the COFINA bondholders of

their property rights in a manner that violates the Takings and Due Process Clauses of the U.S. Constitution.

135.    Ambac is entitled to an injunction prohibiting the Defendants from taking or causing to be taken any action pursuant to the Fiscal Plan and Fiscal Plan Compliance Law.

## THIRD CLAIM FOR RELIEF

### (For Declaratory And Injunctive Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of Section 303 Of PROMESA)

136.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 135 hereof, as if fully set forth herein.

137.    The Fiscal Plan has harmed Ambac and the COFINA bondholders by diverting funds pledged to secure the payment of the COFINA bonds to other, junior purposes.  As such, the Fiscal Plan is an unlawful executive order that is preempted by Section 303(3) of PROMESA.

138.    The Fiscal Plan Compliance Law has harmed Ambac and the COFINA bondholders by prescribing a method of composition of indebtedness, without the consent of Ambac or the COFINA bondholders, that diverts funds contractually pledged to secure the payment of the COFINA bonds to other purposes.  As such, the Fiscal Plan Compliance Law unlawfully binds creditors and is preempted by Section 303(1) of PROMESA.

139.    An actual, justiciable controversy exists between the parties.

140.    Ambac is entitled to a declaratory judgment that the Fiscal Plan and Fiscal Plan Compliance Law are each preempted by Section 303 of PROMESA, and an injunction prohibiting Defendants from taking or causing to be taken any action pursuant to the Fiscal Plan or Fiscal Plan Compliance Law.

## FOURTH CLAIM FOR RELIEF

**(For Declaratory And Injunctive Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of Section 407 Of PROMESA)**

141.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 140 hereof, as if fully set forth herein

142.    The Fiscal Plan and Fiscal Plan Compliance Law are harming, and will continue to harm, Ambac and the COFINA bondholders by causing the transfer of funds, including SUT Revenues, in violation of (i) applicable laws under which Ambac and the COFINA bondholders are granted valid pledges of, security interests in, and liens on the SUT Revenues; and (ii) applicable laws ensuring the SUT Revenues are transferred for the benefit of COFINA's creditors.  As such, any transferee of such property, including the Commonwealth, is liable for the full value of such transfers under Section 407 of PROMESA.

143.    An actual justiciable controversy exists between the parties.

144.    Ambac is entitled to an order declaring that transferees of property transferred as a result of the Fiscal Plan and the Fiscal Plan Compliance Law are each liable for the value of such transfers under Section 407 of PROMESA.

## RELIEF DEMANDED

WHEREFORE Ambac respectfully requests that the Court enter judgment against Defendants as follows:

(a)    Declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Contracts Clause of Article I of the U.S. Constitution; (ii) that the Fiscal Plan and the Fiscal Plan Compliance Law each unlawfully interferes with and impedes the Ambac's contractual rights; and (iii) that the Fiscal Plan and the Fiscal Plan Compliance Law are each unlawful, invalid, null, and void;

(b)     Declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Fifth and Fourteenth Amendments of the U.S. Constitution; and (ii) that the Fiscal Plan and the Fiscal Plan Compliance Law are each unlawful, invalid, null, and void;

(c)     Declaring (i) that the Fiscal Plan and Fiscal Plan Compliance Law are expressly preempted by Section 303 of PROMESA; and (ii) that each is unlawful, invalid, null, and void;

(d)     Declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law each violate Section 407 of PROMESA; and (ii) that each is unlawful, invalid, null, and void;

(e)     Declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law violate the Commonwealth's covenant under the COFINA Resolution not to limit or restrict COFINA's ability to meet its obligations COFINA's bondholders; and (ii) that said violation constitutes an Event of Default under the COFINA Resolution;

(f)     Declaring (i) that the Fiscal Plan and the Fiscal Plan Compliance Law violate COFINA's covenant under the COFINA Resolution to defend, preserve and protect the COFINA structure and the rights of COFINA's bondholders; and (ii) that said violation constitutes an Event of Default under the COFINA Resolution;

(g)     Enjoining Defendants from taking or causing to be taken any action pursuant to the Fiscal Plan and the Fiscal Plan Compliance Law, including the filing of any Title III petitions or any future legislation, rules, budgets, or restructuring plans premised on the Fiscal Plan;

(h)     Declaring that transferees of any funds transferred as a result of the Fiscal Plan and the Fiscal Plan Compliance Law are each liable for the value of such transfers under PROMESA; and

(g)     Granting such further relief as the Court deems just and proper.

Dated:  San Juan, Puerto Rico
        May 2, 2017

FERRAIUOLI LLC

By: /s/ *Roberto Cámara Fuertes*
    Roberto Cámara Fuertes
    USDC-PR No. 219002
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com

MILBANK, TWEED, HADLEY & McCLOY LLP

By: /s/ *Andrew M. Leblanc*
    Dennis F. Dunne (*pro hac vice forthcoming*)
    Andrew M. Leblanc (*pro hac vice forthcoming)*
    Atara Miller (*pro hac vice forthcoming*)
    Grant R. Mainland (*pro hac vice forthcoming*)
    28 Liberty Street
    New York, NY 10005
    Telephone: (212) 530-5770
    Facsimile:  (212) 822-5770
    Email: ddunne@milbank.com
        aleblanc@milbank.com
        amiller@milbank.com
        gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*